UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DR. THOMAS HUBBARD, PhD, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 1:20-cv-1140 |
| v. | ) | |
| | ) | |
| HOLLIE GREEN, | ) | |
| | ) | |
| *Defendant.* | ) | |

HOLLIE GREEN'S ANSWER AND DEFENSES
TO PLAINTIFF'S ORIGINAL COMPLAINT

I.      Introduction

1.      Casting himself as the victim of "mob bullying," Plaintiff Professor Thomas Hubbard ("Plaintiff") of the University of Texas at Austin ("UT") has taken it upon himself to sue multiple UT students,[1] including Defendant Hollie Green ("Hollie"), for their fundamentally accurate criticisms of Plaintiff's (1) open advocacy for male pederastic relationships, which under present mainstream scholarship and under current law are literal child abuse; (2) desire to lower the age of consent for minor males; and (3) insensitive and tone-deaf approach to addressing sexual violence against women.

---

[1] In litigation with another UT student, Plaintiff has used court pleadings as an attempt to smear the student's character and cast aspersions on her publicly, apparently by mining social media for details intended to make her look bad to this court and the public.  Plaintiff went so far as to attack her based on her father's occupation, and to call her narcissistic, privileged, and "sexualized."  These types of attacks are wholly immaterial to any legitimate claim of defamation, and demonstrate Plaintiff's intent to intimidate anyone who dares to criticize his work.  *See Hubbard v. Blakemore,* Case No. 1:20-cv-00767-RP, W.D.Tex. 2020, Dkt. 9.

2.      Hollie is a student concerned about the teaching and scholarship advocated for by Plaintiff.

3.      The confused Complaint does not identify specific false and defamatory statements, but the following seems to be all of what Plaintiff complains about Hollie saying:

- That Hollie has described Plaintiff as "advocating" for pedophilic relationships, when he merely wants people to understand Ancient Greek pederasty in its context. *See* Pl.'s Compl., Dkt. 1, ¶¶ 18-19, 21.

- The Hollie has used the word "pedophilia" instead of "pederasty" to describe the relationships Plaintiff studies. *See id.*, ¶ 19, 21.

- The Hollie claimed that Plaintiff was published by and was associated with NAMBLA. *See id.*, ¶ 11

- That Hollie claimed he had taught a class about rape in which he asked students to describe their sexual experiences and that he has claimed women students are often not objective enough to study rape. *See id.*, ¶¶ 14, 19, 21.

- That Hollie claimed that this class was called "Mythology of Rape" when it was in fact called "Mythologies of Rape." *See id.* at ¶¶ 12, 21.

- That Hollie claimed this class was banned after it ran for one semester and never returned. *Id.*

- That Hollie misstated the date that Plaintiff was tenured. *Id.* at ¶ 10.

4.      The overwhelming problem with Plaintiff's complaint is that everything Hollie has said is true, or substantially true, as will be addressed paragraph by paragraph in the material responsive to the Complaint allegations below. She did unknowingly misstate his date of tenure, but it is unclear how anyone could find that mistake defamatory.

5.      Plaintiff's "scholarship" frequently discusses relationships between men and boys that today's standards regard as child sexual abuse (a fact that he acknowledges). He has moderated conferences about the topic of pedophilia and other sexual practices involving children who have not yet reached the age of consent. He publishes books and articles that question whether

relationships between older men and boys are actually detrimental, or whether therapists and other mental health professionals actually cause the harm by *suggesting* that said relationships are abusive. His own work recognizes that many people regard these topics as controversial and dangerous.

6.   For example, the Foreword in a book he edited, entitled "Censoring Sex Research: The Debate Over Male Intergenerational Relations,"[2] actually refers to "child sexual abuse" as "CSA," as a part of its effort to lessen the negative associations with the words themselves. The Foreword begins:

> The essays in this important book challenge readers to think outside the box. instead of viewing all sex across the age of consent as abuse, the authors address this topic without prejudgment.

It thereafter continues:

> In contemporary Western societies, the drive to "protect" children has meant that any taboo sex across the age of consent means automatic criminalization of that behavior and the attendant categorization of the adults as "sexual predators" and the minors as "victims." The adults are further assumed to be "pedophiles" (thus conflating pedophilia— sexual attraction to preadolescents—with hebephilia—attraction to adolescents), and all minors are assumed to be "children," without any agency.

7.   The Introduction which follows is specifically attributed to Plaintiff. In it, he writes:

> The story of how this volume came into existence, despite corporate cowardice in the face of preemptive attacks by right-wing media and screwball special interest groups, is also an explanation of why the volume is necessary in an era when even the most restrained and balanced academic discussions are too often silenced by the demands of political correctness. The question of the sexually active "child," and particularly the child who is sexually active with an adult, stirs strong emotional reactions not only in the self-

---

[2] The book was copyrighted in 2013 and is available at
https://www.ipce.info/sites/ipce.info/files/biblio_attachments/taboo_sex_research_thinking_outside_the_box_article_and_book_table_of_contents.pdf

proclaimed champions of "family values," but even among many feminists, therapists, and social liberals who are sensitive to relationship structures of social inequality and power imbalance and aware of the very real harm that coercive or manipulative relationships can inflict upon young children.[3]

And he thereafter continues:

> Just as American sex education arguably does more harm to teens than good, it has been argued that therapeutic responses to CSA often have the long-term effect of worsening the self-esteem of victims more than the initial impact of the events themselves. such was the conclusion of Harvard research psychologist Susan Clancy (2009), who conducted in-depth interviews of nearly 200 CSA victims over several years. Contrary to her initial expectations, she found that most respondents who reported childhood sexual encounters with adults felt no trauma at the time the events occurred, when the sexual and social meaning of the acts performed was not yet clear to them. Rather, the harm stemmed from much later retrospective feelings of shame traceable to the victims' perception that they might have been too acquiescent or cooperative as children. This sense of shame and its attendant psychological maladjustments are exacerbated by the popular stereotype of CSA as a traumatic event that is supposed to create immediate fear and aversion in the victim; too many victims simply felt that because this model clearly did not apply to them, they were themselves abnormal and perhaps responsible for what happened. The real harm of CSA is thus in many cases iatrogenic, as victims find their own experiences out of synch with the prevailing social narratives engendered by outmoded clinical orthodoxies about children never cooperating with or enjoying their "abuse," even in the many cases when it occurs at the hands of a beloved family member or friend.

8.     Plaintiff also runs (as CEO and President) a tiny non-profit organization called the William A. Percy Foundation, as well as its website.  This website also sometimes addresses the topic of child sexual abuse, for example suggesting that child pornography does not lead to offenses against children:

**Do Illegal Images Encourage Child Molestation?**– Mere possession of child pornography (which includes images to fully sexually mature adolescents) is one of the most rapidly growing offenses prosecuted in

---

[3] Notably, the book itself contains an extended discussion of how the original publisher did not want to publish the main essay as drafted, after receiving extensive feedback by concerned peers and academics.  Hubbard and his co-editor thereafter mounted a vociferous complaint and fight with the publisher, and ultimately found another publishing house to put out their volume devoted to the taboos of relationships between adult men and pre-teen and teen boys.

**DEFENDANT'S ANSWER AND DEFENSES – PAGE 4**

> the U.S. federal system, earning those convicted an average sentence of 12.5 years (according to Department of Justice statistics). Often, the images in question are old and feature mere nudity, little different from what is found in naturist literature and legitimate art photography. In this brief, a well-known criminologist and expert witness reviews the most recent scholarship on the question, and concludes that there is no credible link between viewing such images and committing hands-on offenses against minors.

[Who we are | William A. Percy Foundation (wapercyfoundation.org)](http://wapercyfoundation.org)[4]

Of course this academic discussion ignores the victimization of a child that *has already occurred* if a person is looking at child pornography, since the image was *produced in the first place*.

9.      Plaintiff sued Defendant Hollie Green and a number of other students in separate lawsuits for taking issue with his statements about "intergenerational" relationships and child sexual abuse.  Hollie's conduct (as well as the conduct of several other students) involved expressing her own view that Plaintiff's teaching and scholarship with regard to child sexual abuse was troubling, and that his attitudes toward rape were misogynist.  Notably, this is a view shared by numerous people in the public, and even was the topic of an editorial in the Dallas Morning News.  Hollie is only one of numerous individuals who have concern over the normalization of sexual relationships between adults and children, and with the suggestion that rape is often just "bad sex," and just one of many who voiced those concerns with regard to the tenor of Plaintiff's publications and teaching.

10.      Despite this, Plaintiff's complaint goes so far as to suggest that Hollie's supposed bullying and defamation drove him from his home and forced him to move to California.  In truth, it appears Plaintiff owned property and ran his nonprofit out of Chico, California for a number of

---

[4] http://wapercyfoundation.org/?page_id=28.  The William A. Percy Foundation for Social & Historical Studies is a non-profit.  Its "Who We Are" page suggests that the organization was founded in honor of two men named William Percy.  The biography of the first Percy ends with "A lover of younger black men, Percy offers a fascinating window into the intersections of race, class, religion, age, and sexuality in the segregated South of the 1920s and 30s."  The other Mr. Percy is in part described as "Sexually active since the age of five, he turned his scholarly attention to gay issues in the 1980s, co-editing the Encyclopedia of Homosexuality with Wayne Dynes, co-authoring with Warren Johansson Outing: Shattering the Conspiracy of Silence (Harrington Park 1994) and Pederasty and Pedagogy in Archaic Greece (University of Illinois Press 1996), as well as significant work on Roman demography."  Plaintiff is the CEO and President of this organization, which appears to be entirely his own, and focused on his own interests.

years prior to any statement Hollie made.  It also appears that he is still a tenured professor at UT, and that he maintains a Texas driver's license and home.

11.     Significantly, Plaintiff has a long pattern of threatening and arguing with those who dare to question or challenge his "scholarship" around the issue of relationships between adult men and boys.  He has written numerous letters threatening lawsuits to multiple individuals, and as noted, has filed at least three separate lawsuits in this court related to similar attempts to silence his critics.

12.     Apart from some technical details like when Plaintiff got tenure, nothing Hollie has said about Plaintiff is fundamentally untrue. Plaintiff hangs his hat on a purported technical, semantic difference between pederasty and pedophilia that even Plaintiff himself cannot be bothered to regularly make.

13.     For example, Plaintiff claims in his Complaint that an article on the Insidehighered website claimed that Plaintiff's work looked at Ancient Greek pederastic relationships and "allow[ed] for the possibility…that certain of these relationships might not be harmful…." Plaintiff then alleges that Hollie summarized this article as reporting that Plaintiff advocated for child sexual abuse. But by any modern legal or scientific standard, Ancient Greek pederasty *is* child sexual abuse. And so while Plaintiff is free to claim and argue that pederasty was not actually harmful, or even that it should be legalized, Hollie is not required to moderate her tone in her vociferous disagreement. She is free to call it exactly what every mainstream professional child welfare organization and psychological or psychiatric association would call it: child sexual abuse.

14.     In fact, Plaintiff himself often refers to pederasty and pedophilia as "child sexual abuse," or the neutralized acronym "CSA," as evidenced in his own Introduction to "Censoring Sex Research: The Debate Over Male Intergenerational Relations," cited above. That piece then

goes on to suggest that people should not forget the "benefit[s]" conferred by predatory sex offenders on children:

> Case studies of notable pedophiles who have attracted recent media attention, such as Penn State football coach Jerry Sandusky or the late entertainers Michael Jackson and Jimmy Savile, reveal a curious mixture of charitable generosity with predatory license. That they will be remembered primarily for the latter should not blind us to the reality of the former. Although all three unquestionably molested some children, it is easy to forget that their enthusiasm for kids benefited many as well. Rather than condemn them as one-dimensional monsters, we should attempt to learn from their human tragedies how easily noble instincts can become perverted into self-destructive obsessions…clinical psychologists and social workers should be encouraged to develop strategies for channeling or sublimating pedophilic tendencies into a more Platonic form of love.

15.     Again, Plaintiff is free to advocate trying to rehabilitate pedophiles by channeling pedophilic tendencies to the benefit of children, but Hollie is free to see this as nothing more than as a recipe for ever more child sexual abuse. Notably, in the very next paragraph of the same writing, Plaintiff himself describes a movie in which a "suspected pedophile" mentors a fatherless teenage boy. Plaintiff does not describe this man as a "suspected pederast."  Because he, like most people in the English-speaking world, uses the term "pederast" merely as a subcategory of the broader term "pedophile." Indeed, in the Foreword to that same work, another academic points out that this broader use of the term "pedophilia" is common throughout America and contemporary Western societies. Yet Plaintiff apparently *now* thinks that the difference between the two is enough to support a defamation claim. It is not.

16.     Plaintiff essentially complains that by not specifying that he only advocates for the possibility of positive sexual relationships between men and *post-pubescent* boys, that somehow she has caused him harm.  His premise, therefore, is that there is an important distinction between

a boy of eleven versus a boy of thirteen, and that a sexual relationship with the latter is more acceptable.

17.    However, Plaintiff even has to mischaracterize his *own work* in order to try to make out the elements of a defamation claim. In paragraph 20 of his petition, Plaintiff claims that he only discussed Ancient Greek pederasty in order to help people "understand it in the context of the Ancient Greeks." But in his *Introduction to Special Issue on "Boys' Sexuality and Age of Consent"* Hubbard decries "Adults' exclusive hold on sexual privilege" and says of another of his works about Ancient Greek pederasty that "I critically examine contemporary American legislative regimes governing adolescent sexuality within a historical perspective *and test the universalizing assumptions of contemporary discourse against the evidence of a highly productive and successful social system that incorporated specific social functions for adolescent male sexuality*." In context, it is clear that the "highly productive and successful social system" being described is Ancient Greek pederasty, a system which, it bears repeating, would be classified as child sexual abuse (1) in present law, and (2) in mainstream medicine and psychology. Hubbard further attacks the present sexual consent laws by saying "I argue that legal regimes created to protect or control girls' sexuality cannot be transferred to boys' sexuality without engendering great harm." Plaintiff has never limited himself to historical examinations of Ancient Greek pederasty—he has instead argued that Ancient Greek pederasty is an important model for modern society to consider in designing modern sexual mores.

18.    Plaintiff *has publicly admitted* he has ties to NAMBLA and he has been published by NAMBLA. His book "Greek Love Reconsidered" contains the following copyright stamp:

Greek Love Reconsidered
First published 2000 by Wallace Hamilton Press
Published simultaneously as NAMBLA Topics 9
© 2000 The North American Man/Boy Love Association

19.     The referenced firm, Wallace Hamilton Press, is a NAMBLA venture, as a NAMBLA member has admitted in Court. *See Curley v. N. Am. Man Boy Love Ass'n*, No. 00-10956-GAO, 2003 U.S. Dist LEXIS 12488, at *28. Plaintiff has also specifically and publicly said that he regards some members of NAMBLA as his friends whom he had worked hard to gain the trust of.

20.     Regardless, as the foregoing demonstrates, Hollie's statements of concern are entirely compatible with and defensible based on Plaintiff's own writings, which are published and available for any reader to take in.

21.     That a tenured professor would sue a student on claims that she attempted to silence *him*, through the vehicle of a defamation claim designed to punish her for accurately characterizing his work, is equal parts ironic and repulsive. Plaintiff should take nothing, and all costs should be assessed against him.

## II.     Plaintiff's Complaint

### A.  Jurisdiction and Venue

1.     With respect to paragraph 1 of Plaintiff's Complaint, Hollie admits that this Court has personal jurisdiction over her and that this Court is a proper venue for this case.

2.     Hollie denies paragraph 2 of Plaintiff's Complaint in its entirety. Hollies denies that the amount-in-controversy exceeds $75,000.00, and Hollie further denies that Plaintiff is domiciled in California. Over the course of discovery, Hollie intends to locate evidence that Plaintiff has invoked the jurisdiction of this court improperly in order to avoid Texas state court

procedures that make frivolous lawsuits designed to suppress constitutionally protected speech, like this one, considerably harder to maintain. Since this implicates this Court's subject matter jurisdiction, this matter cannot be waived by answering.

3.      Hollie denies paragraph 3 of Plaintiff's Complaint in part. Specifically, Hollie admits that Plaintiff is a natural person who may be served through his counsel, and denies that he is a permanent resident and citizen of the State of California.

4.      Hollie admits the allegations in paragraph 4 of Plaintiff's Complaint, except that she would add that she would prefer to be served through her counsel.

**B.  Factual Background**

5.      Hollie admits the allegations in paragraph 5 of Plaintiff's Complaint that he is a faculty member at the University of Texas at Austin, and that he is in the Classics Department and that he is a faculty affiliate of the Center for Women's and Gender Studies. Hollie otherwise denies the allegations in paragraph 5.

6.      Hollie admits the allegations in paragraph 6 of Plaintiff's Complaint.

7.      Hollie admits the allegations in paragraph 7 of Plaintiff's Complaint.

8.      Hollie admits the allegation in paragraph 8 of Plaintiff's Complaint that she tweeted the described tweet. Hollie otherwise denies the allegations in paragraph 8.

9.      Hollie denies all of the allegations in paragraph 9 of Plaintiff's Complaint, which state that the "Publications contain numerous false statements of fact concerning Mr. Hubbard." The statements in the publication are true, substantially true, statements of opinion, rhetorical hyperbole, or otherwise non-defamatory in their entirety.

10.     Hollie lacks information sufficient to admit or deny the allegation in paragraph 10 of Plaintiff's Complaint that he received tenure in 1993 or that he became a full professor in 1998.

Hollie denies that any discrepancy in this irrelevant fact in any way demonstrates a lack of care on Hollie's part or in any way defames or contributes to the defamation of Plaintiff.

11.     With respect to paragraph 11 of Plaintiff's Complaint, Hollie admits that the Publications characterize Plaintiff as "ha[ving] ties with NAMBLA" and being published by NAMBLA. Hollie admits that the linked material indicated that Wikipedia listed Plaintiff was an "Associated Individual" of NAMBLA.[5] Hollie denies the allegation in paragraph 11 of Plaintiff's Complaint that he has in any way refuted this association, that Plaintiff's associations with NAMBLA are a "hoax" or that Wikipedia's indication that Plaintiff is associated with NAMBLA being removed in any way suggests that Plaintiff's public and known association with NAMBLA is any less real.. Hollie denies any and all other allegations or implications in paragraph 11 of Plaintiff's Complaint.

12.     Hollie admits the allegation in paragraph 12 of Plaintiff's Complaint that she accidentally called his "Mythologies of Rape" course "Mythology of Rape." Hollie denies the allegation in the same paragraph that this course was not banned. Hollie denies any other allegations or implications in this paragraph.

13.     Hollie admits the allegations in paragraph 13 of Plaintiff's Complaint that state what the link and relevant article actually say. Hollie admits that she "fail[ed] to mention" the American Philological Association's intervention. Hollie denies that it is inaccurate to claim that this article reveals promotion of pedophilia or child sexual abuse. Hollie admits that she used the

---

[5] Records of Plaintiff's attempt to get Wikipedia to remove the statement linked by Hollie indicating that he was associated with NAMBLA show (1) that the listing had a basis in fact and was not, in any sense, a "hoax" and (2) that Plaintiff's claims not to be associated with NAMBLA are based entirely on the same kinds of semantic distinctions that render his other defamation claims baseless. Moreover, when Hollie made the post containing the link to the Wikipedia article, the linked page specifically did indicate that Hubbard was associated with NAMBLA; even if none of the rest of this was true, therefore, Hollie had a good faith, non-negligent and non-malicious belief that what she was saying was true.

word "pedophilia" here, but denies that this conveys a false impression or is in any sense defamatory.

14.    Hollie admits that she said that the course was banned, as alleged in paragraph 14 of Plaintiff's Complaint, but denies that this statement was false or defamatory. Hollie admits that she indicated that Plaintiff "stated" the matter in quotes, but in context, it was clear that Hollie was paraphrasing:

> 2018 *Classical Association of the Middle West and South* Convention. **In this talk he advocated against "affirmative verbal consent" laws. He also stated that female students are often too objective to study rape academically because they " tend to come into the class with strong preconceived positions, based on negative personal experiences they or close friends have had with the issue."** These quotes were pulled directly from his presentation's abstract:

The precise words that Hollie attributes to plaintiff are those within the preceding quote, not those quoted in Plaintiff's Complaint, and the words Hollie quotes Plaintiff as saying are accurate. Plaintiff does not claim that Hollie's summary is false, so this statement cannot support a defamation claim. Hollie denies any other allegations or implications in paragraph 14 of Plaintiff's Complaint.

15.    Hollie admits that the allegation in paragraph 15 of Plaintiff's Complaint that she indicated that he was referring to pedophilic relationships in certain of his works. Hollie denies that this statement can have any defamatory effect as compared to pederastic relationships.

16.    Hollie admits what she wrote about the assignment described in paragraph 16 of Plaintiff's Complaint. Hollie denies that her assessment of this assignment is inaccurate or untrue, or that her description thereof is capable of defamatory meaning.

17.    Hollie admits the allegation in paragraph 17 of Plaintiff's Complaint that some of the links no longer work. Hollie lacks information sufficient to admit or deny the baseless conclusions Plaintiff draws from that.

18.     Hollie admits that the gist of her statements is that Plaintiff advocates for the legalization and destigmatization of what almost everyone in America would characterize as pedophilia. Hollie further admits that her statements point out Plaintiff's tone deaf and insensitive attitude toward sexual assault against women. Hollie further admits that she characterized the "Mythologies of Rape" course as banned. Hollie denies all other allegations in paragraph 18 of Plaintiff's Complaint, denies any other characterization of her statements, denies that these statements are false, and denies that these statements are capable of defamatory meaning under the law.

19.     Hollie denies all of the allegations in paragraph 19 of Plaintiff's Complaint, as Plaintiff has repeatedly advocated for the destigmatization and normalization of pederastic relationships.

20.     Plaintiff's sole allegation in paragraph 20 that he has only ever advocated for pederasty to be understood "in the context of the Ancient Greeks" is utterly false, and therefore Hollie denies it. It is not a close question, or a question of interpretation: Plaintiff has repeatedly brought Ancient Greek pederasty into the conversation about *modern sexuality and consent*, as is shown by Plaintiff's own words, quoted above. He has written a work titled "Sexual Consent and the Adolescent Male, or What Can We Learn from the Greeks." Plaintiff knows that this is the case—he knows that his discussions of pederasty have *never* been limited to historical examination or understanding. Hollie asks that Plaintiff immediately clarify this statement in his present pleadings to avoid misleading the Court.

21.     Hollie denies all of the allegations in paragraph 21 of Plaintiff's Complaint.

22.     Hollie denies that any of her statements caused any injury to Plaintiff. Hollie lacks sufficient information to admit or deny the events described in paragraph 22 of Plaintiff's

Complaint regarding the graffiti or the alleged attack on Plaintiff's home, and Hollie denies that she is liable for the tortious acts of any third party.

23.     Hollie denies all of the allegations in paragraph 23 of Plaintiff's Complaint.

## C.  Cause of Action

24.     Hollie admits, denies, and lacks information sufficient to admit or deny all of the allegations incorporated into paragraph 24 of Plaintiff's Complaint as stated above.

25.     Hollie denies that Plaintiff is not a limited purpose public figure as Plaintiff alleges in paragraph 25 of Plaintiff's Complaint. Hollie denies that the statements were *per se* defamatory, or defamatory *per quod*. Hollie denies all of the other allegations in paragraph 25 of Plaintiff's Complaint.

26.     Hollie denies the allegations in paragraph 26 of Plaintiff's Complaint.

## D.  Conditions Precedent

27.     Hollie denies the allegations in paragraph 27 of Plaintiff's Complaint.

### III.     Defenses and Affirmative Defenses

Hollie asserts the following defenses to the claims set out in Plaintiff's Complaint.  By asserting these defenses, Hollie does not assume any burden of proof not otherwise legally assigned to her.

1.     The statements were true.

2.     The statements were substantially true.

3.     The statements were not factual, but merely statements of opinion.

4.     The statements were rhetorical hyperbole.

5.     The statements were not defamatory, either *per se* or *per quod*.

6.      Plaintiff's reputation was so tarnished before these statements that he cannot be defamed by them.

7.      Any injury to Plaintiff's reputation or otherwise was actually caused by other third parties who publicized this controversy far more broadly than Hollie did.

8.      Hollie was speaking on matters of public concern—child sexual abuse, the age of consent, and sexual violence against women— Plaintiff is a limited purpose public figure with respect to the statements, and the statements were not made with actual malice.

9.      Hollie was not negligent in making the statements.

10.     Plaintiff fails to state a claim on which relief can be granted.

11.     Hollie is not responsible for the tortious or criminal actions of independent third persons.

12.     Plaintiff is not entitled to the jurisdiction of this Court because he is domiciled and/or the amount actually in controversy in this case is less than the jurisdictional minimum in Texas.

13.     The statements made by Hollie were not defamatory given the significant history of Plaintiff's own published speech in support of sexual relationships between adult men and boys who have not reached the age of consent.

## IV.     Conclusion and Prayer

Hollie asks that Plaintiff take nothing, and that all costs of court be assessed against him.

DATED: January 22, 2021                    Respectfully submitted,

                                           */s/ Jennifer R. Ecklund*
                                           Jennifer R. Ecklund
                                           Texas Bar No. 24045626
                                           jecklund@thompsoncoburn.com
                                           John P. Atkins
                                           Texas Bar No. 24097326
                                           jatkins@thompsoncoburn.com

                                           **THOMPSON COBURN LLP**
                                           2100 Ross Ave, Suite 600
                                           Dallas, Texas 75201
                                           (214) 629-7100
                                           (214) 629-7171 (facsimile)

                                           ***ATTORNEYS FOR DEFENDANT HOLLIE GREEN***

## CERTIFICATE OF SERVICE

    This document was filed electronically on January 22, 2021, and a copy of this document has been served on all counsel of record.

                                           */s/ John P. Atkins*